FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 31 2017 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

MOISES VARGAS, JR.,

                      Plaintiff,

      —against—

CITY OF NEW YORK,

                      Defendant.

------------------------------------------------------x

**MEMORANDUM AND ORDER**

13-CV-3188 (SLT)

**TOWNES, United States District Judge:**

      Plaintiff Moises Vargas, Jr. ("Plaintiff") brings this action against defendant City of New York ("Defendant" or "City"), principally alleging false arrest in connection with an altercation that occurred on May 17, 2012, and deliberate indifference to serious medical needs arising from that altercation. Defendant now moves for summary judgment, arguing that Plaintiff cannot establish a basis for municipal liability and lacks the evidence to make out false arrest, deliberate indifference, and other claims against any individual defendants. For the reasons stated below, Defendant's motion is granted.

## BACKGROUND

      Except as otherwise indicated, the following facts are either undisputed or drawn from a transcript of Plaintiff's July 23, 2014, deposition ("Plaintiff's Deposition"), which is attached to the Declaration of Omar J. Siddiqi in Support of Defendant's Motion for Summary Judgment (the "Siddiqi Declaration") as Exhibit A. Plaintiff was born in Puerto Rico in 1964 and attended high school in the Bronx. (Plaintiff's Deposition, pp. 8-9). He completed eleventh grade, but dropped out of school after the first of his two daughters was born. (*Id.*, pp. 8-11). Over the next

25 years or so, he worked in various capacities: as a handyman, in a YMCA, as a steel mechanic, and in the film industry. (*Id.*, p. 9).

In 2007, Plaintiff was working as a supervisor on a contruction project, overseeing twenty workers involved in building a Walgreeens pharmacy on Staten Island. (*Id.*, pp. 22, 60). One day, while leaving a deli where he had just had lunch, he was struck by a car and thrown 20 to 25 feet. (*Id.*). According to Plaintiff, MRIs taken after this accident revealed eight herniated discs: four in his upper spine and four in his lower back. (*Id.*, pp. 21, 23).

Plaintiff worked intermittently for a few more months before he stopped working altogether in the Winter of 2007. (*Id.*, pp. 60-61). Plaintiff was unemployed thereafter, with the exception of a four-to-six month period in 2010 or 2011 during which he was employed by a film production company to supervise workers. (*Id.*, pp. 59, 61-62). Plaintiff was on public assistance at the time of his July 2014 deposition and testified that he had been on public assistance for the preceding five or six years. (*Id.*, p. 10).

### The May 17, 2012, Incident

Plaintiff was not working on May 17, 2012, when he received a call from Maria Lindo, a friend who lived at 212 Heberton Avenue in Staten Island. (*Id.*, pp. 31, 50). She asked that Plaintiff come to her house because she wanted to ensure that work on her flooring was being done properly. (*Id.*). Plaintiff agreed to do so and drove to her house, arriving sometime late in the morning. (*Id.*, pp. 32-33; Defendant's Local Rule 56.1 Statement of Undisputed Facts ("Defendant's 56.1 Statement"), ¶ 1; Response to Rule 56.1 Statement ("Plaintiff's 56.1 Statement"), ¶ 1).

Using a cane, Plaintiff walked from his van to the steps of Lindo's house, where he proceeded to sit down. (Plaintiff's Deposition, pp. 30, 32). Lindo invited him inside, but Plaintiff declined, saying that he did not "feel like going up." (*Id.*, p. 32). Lindo then left to take her dog for a walk, telling Plaintiff that the handyman was expected to arrive momentarily. (*Id.*). She did not tell Plaintiff who the handyman was, but expressed the expectation that Plaintiff would know him because he had "seen him around." (*Id.*).

Ten to fifteen minutes after Plaintiff arrived at Lindo's house, another man drove up in a small car. (*Id.*, pp. 37-38, 50; Defendant's 56.1 Statement, ¶ 2; Plaintiff's 56.1 Statement, ¶ 2). The man was white, about 50 years old and, according to Plaintiff, "looked like an addict but a clean addict." (Plaintiff's Deposition, p. 34). Plaintiff claims that he knew the man—later identified as Frank Papapietro—was not the handyman, (*id.*, p. 33), although it is unclear precisely why. Plaintiff initially testified that he knew the man was not the handyman because he had "never seen him before." (*Id.*, p. 33). Plaintiff later testified to the contrary, stating that he "had seen him around the neighborhood" in "back corners where people cop drugs," and had seen him steal power tools and other things from people's garages. (*Id.*, pp. 37, 41-42, 51).

Plaintiff confronted Papapietro, asking either what he was doing there or what he wanted. (*Id.*, pp. 33, 38, 50). It is unclear whether Papapietro answered. Plaintiff initially testified that Papapietro said he was "just looking around," prompting Plaintiff to ask "for what?" (*Id.*, p. 33). Later, Plaintiff testified that the man did not answer at all. (*Id.*, pp. 50-51).

Although Plaintiff's testimony was inconsistent with regards to whether Papapietro responded verbally, he testified unequivocally that Papapietro responded physically seconds after Plaintiff first confronted him. According to Plaintiff, the man surprised him with a punch to the

right temple, causing him to drop his cane. (*Id.*, pp. 33, 42-43). The man then attempted to strike Plaintiff with a pipe, which he had concealed behind his back. (*Id.*, pp. 38-39, 43). Plaintiff not only frustrated that attempt, but managed to knock the man down and to wrest control of the pipe from him in the process. (*Id.*, pp. 34, 39, 43). Plaintiff claims that he did not swing the pipe at his assailant, but threw it as far away as he could. (*Id.*, pp. 39-40). Indeed, Plaintiff claims that he could not recall intentionally striking the assailant at any time, though he may have hit him with his head or elbow in the course of the struggle. (*Id.*, pp. 39-40, 43).

Plaintiff then fell and the two men rolled on the ground. (*Id.*, p. 43). Papapietro eventually regained his feet, but Plaintiff had a problem standing up. (*Id.*). Papapiero then tackled Plaintiff, sending him flying three to five feet backwards. (*Id.*, pp. 43, 58-59). Plaintiff landed flat on his back on a concrete driveway and "was immobilized," with "no strength at all." (*Id.*, pp. 40, 52). Although his adversary "could have done anything" to him at that point, onlookers immediately broke up the fight. (*Id.*, p. 40).

Plaintiff then crawled to his cell phone and called 911. (*Id.*, pp. 40, 52-53). The police responded "very fast," arriving less than two minutes after the fight started. (*Id.*, p. 44). Soon, there were 20 officers on the scene—all, or mostly, young and mostly white. (*Id.*). Nonetheless, Plaintiff remained on the phone until an unmarked, black car arrived, four to five minutes later. (*Id.*, pp. 45, 55). At his deposition, Plaintiff claimed that he could not recall what he said during that call because he was in pain, agitated, and "emotionally distraught." (*Id.*, p. 53). However, he testified that he did not tell the 911 operator that he needed medical assistance "because ... the black car came and I hung up." (*Id.*, p. 55).

Plaintiff claims that he asked officers at the scene for medical treatment. According to Plaintiff, he asked for medical treatment immediately when the officers arrived and approached him. (*Id.*, p. 54). Plaintiff could not recall exactly what he said, but claims that he indicated that he had "a bad back" or "a condition," was in pain, and needed to go to the hospital or to see a doctor. (*Id.*, p. 55). He may have also asked them to call an ambulance, but he received no assistance. (*Id.*, p. 55).

Initially, the uniformed officers handcuffed Papapietro. (*Id.*, p. 34). Thereafter, two plainclothes officers who arrived in the black car spoke to Papapietro. (*Id.*, pp. 46-47). Plaintiff could not describe these officers, except to say that they were in their mid- to late-40s and were "white, real white." (*Id.*, p. 45).

Plaintiff does not know exactly what Papapietro told the plainclothes officers. (Plaintiff's 56.1 Statement, ¶ 8). Following this conversation, however, the police took the handcuffs off Papapietro and handcuffed Plaintiff instead. (Plaintiff's Deposition, pp. 34, 46-47). The police did not say anything to Plaintiff, other than to inform him that he was under arrest. (*Id.*, pp. 47-48). Plaintiff claims that he did not struggle while being handcuffed and that none of the officers punched, hit, or kicked him. (*Id.*; Defendant's 56.1 Statement, ¶ 12; Plaintiff's 56.1 Statement, ¶ 12). Yet, according to Plaintiff, the police placed him in a police car by picking him up off the ground and tossing him face-first into the back seat. (*Id.*, pp. 48-49, 54).

Two officers then drove Plaintiff to the 120th Precinct. (*Id.*, p. 49; Defendant's 56.1 Statement, ¶ 11; Plaintiff's 56.1 Statement, ¶ 11). There, the arresting officer, Craig Spataro, created an arrest report which charged Plaintiff with assault with intent to cause physical injury with a weapon, criminal possession of a weapon in the fourth degree, and menacing in the third

degree. (Plaintiff's Deposition, pp. 45-46; Defendant's 56.1 Statement, ¶ 10; Plaintiff's 56.1 Statement, ¶ 10). Papapietro was also brought to the precinct but was not arrested. (Plaintiff's Deposition, pp. 49). Although Plaintiff complained that he was in "extreme pain" and specifically told the desk sergeant that he had eight herniated discs, Plaintiff was not given medical treatment but was told to "shut up." (*Id.*, pp. 34, 55-56). In contrast, the police called an ambulance to tend to Papapietro. (*Id.*, pp. 34, 49).

While the parties agree that Plaintiff was eventually taken to the hospital, the parties disagree as to when that occurred. Defendant has adduced evidence that Plaintiff was transported to Richmond University Medical Center sometime on May 18, 2012—the day after he was arrested—and was treated there for a muscle spasm in his back. (*See* Defendant's 56.1 Statement, ¶ 14). Plaintiff, however, claims that he was taken to the hospital 40 to 60 hours after he was arrested, and not on May 18. (Plaintiff's Deposition, p. 19; Plaintiff's 56.1 Statement, ¶ 14). Indeed, Plaintiff testified that he was taken to the hospital only after a non-white court officer noticed that he was limping with tears in his eyes and said that Plaintiff could not "go to see the judge like that." (Plaintiff's Deposition, p. 35).

En route to the hospital, Plaintiff had a conversation about the delay in medical treatment with the "white cop" who escorted him. (*Id.*). According to Plaintiff, the officer explained:

> I'm the only cop that takes people to see the doctor and I wasn't in yesterday. If somebody is really hurting they got nobody to take them to the doctor. That's the way it is, budgets, talk to the mayor or something, wiseguy. (*Id.*).

By all accounts, Plaintiff did not receive extensive treatment. Plaintiff testified that he received only "a pill," (*id.*), but did not provide any other details. According to Defendant,

medical records establish that Plaintiff was given both Flexeril (a muscle relaxant) and an injection of Toradol I.M. (a nonsteroid anti-inflammatory drug). (*See* Defendant's 56.1 Statement, ¶¶ 14-15).

According to Plaintiff, he first appeared before a judge a day or two after he visited the hospital. (Plaintiff's Deposition, p. 36). The judge appeared to be willing to release Plaintiff on recognizance until the prosecutor discovered that Plaintiff had an outstanding warrant, which had been issued in the Bronx in 1984. (*Id.*). Plaintiff was then taken to the Bronx, where bail was originally set at $1,000 but then increased to $5,000 after the prosecutor represented that a machete had been found at 212 Heberton Avenue. (*Id.*). Plaintiff admits that he knew there was a machete on the property, but claims that he "didn't know exactly" where the machete was located. (*Id.*, p. 41). Plaintiff also testified, however, that he was charged with "a felony because the machete was involved." (*Id.*, p. 63).

Plaintiff spent nine days in jail on Rikers Island before his relatives could raise the $5,000 bail. (*Id.*, pp. 36, 58, 67-68). He then spent the next year and one-half fighting the charges that were pending against him, appearing in court approximately once every two months. (*Id.*, p. 64). On September 5, 2013, after Plaintiff had made "a little more" than ten appearances, the Criminal Court of the City of New York, Richmond County, dismissed all claims against Plaintiff. (*Id.*; Defendant's 56.1 Statement, ¶ 16; Plaintiff's 56.1 Statement, ¶ 16).

### *The Instant Action*

On May 31, 2013, more than three months before the charges against him were dismissed, Plaintiff commenced this *pro se* action. Plaintiff's original complaint consisted of a one-page form containing four paragraphs, which prompted the plaintiff to 1) list the parties and

their addresses, 2) state a basis for federal jurisdiction, 3) provide a "clear and concise statement of facts," and 4) request a remedy. In the first paragraph, Plaintiff listed only one defendant—the N.Y.P.D.—and listed its address as the "120 Pct." In the second paragraph, Plaintiff completed a sentence which began, "The jurisdiction of the Court is invoked pursuant to," by writing the word, "Federal."

In the third paragraph, Plaintiff expressly alleged "false arrest" and alluded to deliberate indifference to his medical needs by writing: "Over 60 hrs no medical treatment." Plaintiff also alleged, "Discrimination in preference considering the other person who was Caucasian already with cuffs," and requested that the "officers involved ... be transferred from the 120 pct." Neither the form complaint nor a one-page narrative attached to the form named any officers, or made any mention of use of force by these officers.

In an order dated June 10, 2013, Magistrate Judge Robert M. Levy granted Plaintiff permission to proceed *in forma pauperis*. The judge noted that Plaintiff did not name an individual police officer in either the caption or the body of the complaint, but that one of the attachments to the pleading was a felony complaint signed by Officer Spataro. Accordingly, the judge ordered that the officer be added as a defendant. While Judge Levy's order noted, in a footnote, that the NYPD lacked the capacity to be sued, it nonetheless directed the United States Marshals Service serve a summons and complaint on both the NYPD and Officer Spataro.

At the initial conference, held October 10, 2013, Judge Levy again informed Plaintiff that the NYPD lacked the capacity to be sued and that he should sue the City of New York (the "City") instead. According to an order issued following the conference, Plaintiff agreed to amend his petition to substitute the City as a defendant. Plaintiff subsequently filed an amended

8

complaint which substituted the City for the NYPD.  However, the amended pleading made no

mention of Officer Spataro.

The amended complaint consisted of a newly drafted one-page form, to which Plaintiff

attached the same one-page narrative that was attached to the original pleading.  Plaintiff again

wrote "Federal" in the second paragraph, which asked the plaintiff to allege a basis for

jurisdiction.  In the third paragraph of the form, which prompted the plaintiff for a "Statement of

Claim," Plaintiff wrote:

> For false arrest, along with all charges of humiliation.  Witheld
> [*sic*] over 60 hrs of medical treatment.  Discrimination in
> preference of considering the other person whom [*sic*] was
> Caucasian that was already in handcuffs.  Continue on the other
> paper.

The "other paper"—the one-page narrative—alleged that the Caucasian man showed the officers

a "business card" immediately before they removed his handcuffs and handcuffed Plaintiff

instead.

The narrative implied that Papapietro was familiar with Plaintiff, stating that the

"trespasser ... personally wanted to cause [him] bodily harm knowing [his] condition."  The

narrative also implied that more than one officer was responsible for delaying his medical

treatment, stating that "[t]he officers started to laugh and refused to take" him for medical

treatment, and that "[o]ne officer made a comment, you should not get into these situation[s]."

However, the pleading did not identify any of the officers or name any of them as a defendant.

***The Instant Motion for Summary Judgment***

The City now moves for summary judgment. The Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Defendant's Memo") assumes that Plaintiff is bringing this action pursuant to 42 U.S.C. § 1983 and principally argues that Plaintiff has not established a basis for municipal liability. Citing to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the City argues that it cannot be sued for the unconstitutional or unlawful acts of its employees, but only for its own unconstitutional or illegal policies, customs, or practices. The City notes that Plaintiff has not even alleged, much less established, the existence of any such policies, customs, or practices.

The City's motion also addresses the merits of various claims that Plaintiff might pursue against individual defendants, even though no individual defendants were named in the amended complaint. First, the City argues that Plaintiff's false arrest claim is untenable because there was probable cause for Plaintiff's arrest. Second, Defendant argues that Plaintiff has not produced evidence that the police were deliberately indifferent to his serious medical needs. Third, the City argues that, even if Plaintiff's amended complaint can be construed as alleging an equal protection claim, there is no evidence that Plaintiff was treated differently than another similarly situated individual. Finally, despite noting that Plaintiff's amended complaint does not allege use of excessive force, the City argues that any force used was reasonable under the circumstances.

In support of these arguments, Defendant has submitted the Siddiqi Declaration, which attaches six exhibits. The first, Exhibit A, is a transcript of Plaintiff's July 23, 2014, deposition, which is discussed above. The second, Exhibit B, is a copy of a Sprint report which reflects the

substance of various 911 calls relating to the altercation between Plaintiff and Papapietro. It indicates that one caller told the police that the fight was between a man with a knife and a man with a pipe.

Exhibit C to the Siddiqi Declaration is an arrest report in which the arresting officer reported that Papapietro said Plaintiff struck him with a lead pipe, causing lacerations to his arms and head. Exhibit D is a "Medical Treatment of Prisoner" form which states that Plaintiff received treatment for a muscle spasm in his back at Richmond University Medical Center on May 18, 2012, and was "treated with Toradol I.M. and Flexeril P.O." Exhibit E is a copy of a Certificate of Disposition from the Criminal Court of the City of New York, Richmond County, which states that all charges against Plaintiff were dismissed on September 3, 2013. The sixth and final exhibit—Exhibit F—is a copy of Plaintiff's amended complaint.

Plaintiff has not submitted a memorandum of law in opposition to Defendant's motion but has submitted an affirmation which incorporates arguments that address some of the points raised in Defendant's Memo. First, Plaintiff acknowledges that he failed to include individual officers as defendants in his amended complaint, but alleges that he did sue "an individual officer" initially and omitted him as a defendant in his amended complaint only because he "did not know that [he] had to name the officer[] again." Plaintiff's Affirmation in Opposition to Summary Judgment Motion ("Plaintiff's Affirmation"), ¶¶ 4-5. Plaintiff also implies that he was prevented from naming other individual officers as defendants by the City's failure to "provide ... the names of the many other officers" who were allegedly involved in the incident. *Id.*, ¶ 4.

Plaintiff then addresses, in separate sections, Defendant's arguments with respect to his false arrest and deliberate indifference claims, asserting that there are disputed issues of material

fact which preclude summary judgment. With respect to the false arrest claim, Plaintiff alleges that there are "material facts in dispute ... about whether the witness/intruder was in fact the perpetrator of a crime and whether his statements or appearance provided probable cause." *Id.*, ¶ 14. Plaintiff asserts that there was probable cause to believe that a crime was committed by the intruder, not by him. *Id.*, ¶ 15. However, Plaintiff's Affirmation does not provide any evidence regarding what information was presented to the police officers. Rather, Plaintiff states only that he was arrested after he "started explaining what was happening" to the police, and implies that the police disbelieved him because Plaintiff was a Latino and the intruder was white. *Id.*, ¶ 26.

With respect to the deliberate indifference claim, Plaintiff states that he told "City officers about [his] pre-existing medical condition and that the intruder had injured [him]," and "cried out in pain many times." *Id.*, ¶ 32. Plaintiff further alleges that the City failed to provide him with medical treatment "for several days," and that the hospital provided him only "with a pain pill," although his injuries were "much more severe." *Id.*, ¶¶ 33, 42. However, medical records attached to Plaintiff's Affirmation as Exhibit C establish that the police took Plaintiff to the emergency room sometime before 12:30 p.m. on May 18, 2012—less than 25 hours after his arrest—and that he was given an injection in addition to a pill.

The medical records provide additional information about Plaintiff's medical history and his May 18, 2012, visit to the emergency room. The records include a radiologist's report relating to August 2007 MRIs of Plaintiff's cervical and lumbosacral spine, which states that Plaintiff had partial congenital fusion of two cervical vertebrae, extradural defects (*i.e.*, defects outside the dura mater) in the four intervertebral spaces between C3 and C7, and bulging discs at C3-C4, L3-L4, L4-L5, and L5-S1. His back condition apparently deteriorated further by May 18,

2012, when Plaintiff reported a "history of 8 herniated discs" and stated that he was seeing a pain management specialist, Dr. Lee. The hospital's records also reflect that Plaintiff had visited the emergency room on April 17, 2012, complaining of back pain and seeking a refill of his pain medication.

The emergency room records state that Plaintiff was only in "mild distress" when he was examined on May 18, 2012, and that he reported being "ambulatory after the incident." After an examination which revealed a "diffusely tender lumbar area" but no other significant findings, emergency room personnel diagnosed Plaintiff with a "mild spasm." They gave him an injection of Toradol and an oral dose of Flexeril and Plaintiff reported feeling "better" an hour later. He was discharged at 3:30 p.m., three hours after he arrived in the emergency room.

Plaintiff's Affirmation does not address Defendant's argument that Plaintiff has failed to establish a basis for municipal liability. In addition, Plaintiff does not present any evidence or arguments to rebut the equal protection claim. Plaintiff mentions the excessive force claim, but only to state: "The police officers ... injured me using excessive force during the arrest." Plaintiff's Affirmation, ¶ 27. Plaintiff does not explain why he failed to raise this issue in his pleadings.

## *DISCUSSION*

### *I. The Summary Judgment Standard*

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, *i.e.*, whether it concerns

13

facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotation omitted; brackets added).

Initially, the moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must then "set forth specific facts showing that there is a genuine issue for trial." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotation omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation and brackets omitted). Moreover, a party cannot sustain its burden in opposing summary judgment by relying on inadmissible hearsay evidence. *See G.I. Home Developing Corp. v. Weis*, 499 F. App'x 87, 90 (2d Cir. 2012) (summary order).

When evaluating a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all ambiguities in his favor. *See Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *see also Swartz v. Insogna*, 704 F.3d 105, 109 (2d Cir. 2013). No genuine triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996). "If the evidence presented by the non-moving

14

party is merely colorable, or is not significantly probative, summary judgment may be granted."

*Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and brackets omitted).

## II. The Basis for Subject-Matter Jurisdiction

Before addressing Defendant's arguments, the Court must first determine the basis for

subject-matter jurisdiction in this case. Neither party has addressed the issue, but federal courts

have an independent obligation to examine the basis of their jurisdiction. *See FW/PBS, Inc. v.*

*City of Dallas*, 493 U.S. 215, 231 (1990), *overruled on other grounds by City of Littleton v. Z.J.*

*Gifts D-4, LLC*, 541 U.S. 774 (2004). If a court "determines at any time that it lacks

subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

The form which Plaintiff used in preparing his original and amended complaints prompts

the user to state a basis for subject-matter jurisdiction. The second paragraph of that form

begins, "The jurisdiction of the Court is invoked pursuant to," then leaves a blank for the user to

complete. In both the original and amended complaints, the *pro se* Plaintiff completed this

paragraph with the word, "Federal." Read liberally, this might suggest that Plaintiff is alleging

federal question jurisdiction under 28 U.S.C. § 1331, which gives district courts jurisdiction of

all civil actions arising under the Constitution, laws, or treaties of the United States. However,

the pleading does not specify the Constitutional or statutory provisions on which Plaintiff relies.

Defendant's Memo assumes that Plaintiff is bringing this action under 42 U.S.C. § 1983

("Section 1983" or "§ 1983"). *See* Defendant's Memo, p. 5. Section 1983 "creates no

substantive rights; it provides only a procedure for redress for the deprivation of rights

established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993), *cert. denied*, 512 U.S.

1240 (1994). In order to maintain a Section 1983 action, a plaintiff must allege both that the

conduct complained of was "committed by a person acting under color of state law" and "deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). Although Plaintiff's pleadings do not specify the Constitutional or statutory rights which were violated, Defendant's motion construes the amended complaint as alleging "false arrest, excessive force, deliberate indifference and equal protection claims." Defendant's Memo, p. 5.

Plaintiff's Affirmation confirms some of Defendant's assumptions. It contains separate sections headed, "Section 1983 False Arrest Claim," Plaintiff's Affirmation, p. 2, and "Failure to Provide Medical Treatment: Due Process Claim." *Id.*, p. 4. However, Plaintiff's Affirmation does not mention, or make any statements suggesting, that Plaintiff is raising, an equal protection claim. It also does not address Defendant's arguments concerning excessive force, except to assert that unspecified police officers injured him by "using excessive force during the arrest." *Id.*, ¶ 27.

Although Plaintiff's pleadings do not list causes of action, "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). A court must "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 878, 790 (2d Cir. 1994)). Accordingly, the Court will construe Plaintiff's amended complaint as alleging jurisdiction under Section 1983 and as alleging claims for false arrest and deliberate indifference to serious medical needs.

In contrast, the Court does not construe Plaintiff's pleadings as alleging excessive force and equal protection claims. First, there is no mention of "excessive force" in either Plaintiff's original pleading or the amended complaint. To be sure, Plaintiff testified at his deposition that he was picked up and tossed face-first into a police car, but those facts were not alleged in either pleading. Furthermore, this use of force was not necessarily unreasonable, since some use of force is inherent in the arrest process and since Plaintiff's testimony suggested that he may have been unable to walk immediately following the incident.

Notably, Plaintiff's Affirmation contains separate sections relating to the false arrest and deliberate indifference claims, but only one sentence mentioning excessive force. That sentence does not respond to Defendant's arguments for dismissing the excessive force claim, but alleges that unspecified "police officers" injured him "using excessive force during the arrest." Plaintiff's Affirmation, ¶ 27. This conclusory sentence does not suggest that Plaintiff can identify the officers, can establish that the use of force was unreasonable, or that the officers knew that the act of tossing Plaintiff onto the padded back seat of a police car created a risk of injury to Plaintiff.

Similarly, while Plaintiff's amended complaint alleges "[d]iscrimination in preference of considering the other person whom [*sic*] was Caucasian that was already in handcuffs," the Court does not construe this allegation as suggesting an equal protection claim. Rather, these allegations appear to support his false arrest and deliberate indifference claims by implying that the police actions were racially motivated. The allegations do not suggest that Plaintiff and Papapietro were similarly situated. Indeed, Plaintiff's Affirmation does not even respond to Defendant's equal protection argument, implying that Plaintiff never intended to make an equal protection claim.

17

### III. Municipal Liability

The only defendant named in the amended complaint is the City. Although municipalities, such as the City of New York, are considered "persons" for purposes of Section 1983, *Monell*, 436 U.S. at 689, the Supreme Court has held that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). Rather, "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original). In other words, it is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

In *Monell* and subsequent cases, the Supreme Court has "required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Brown*, 520 U.S. at 403 (citing cases). A municipal "policy" results "from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Id.* at 403-04 (citing *Monell*, 436 U.S. at 694). A "custom" is a practice which, although not formally approved by an appropriate decisionmaker, is "so widespread as to have the force of law." *Id.* at 404 (citing *Monell*, 436 U.S. at 690-91). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

As Defendant's Memo correctly notes, Plaintiff's amended complaint "contains no factual allegations about ... a municipal policy, custom or practice or any actions by a policy-making official that directly led to plaintiff's alleged constitutional injuries." Defendant's Memo, p. 15. Indeed, the body of the amended complaint does not even mention the City. Accordingly, the amended complaint does not state a claim for municipal liability. *See Brown*, 520 U.S. at 403; *Tuttle*, 471 U.S. at 823-24.

Plaintiff, who has not submitted a memorandum of law, does not address Defendant's argument for summary judgment on his municipal liability claim. Although Plaintiff has filed an affirmation, that submission does not allege any facts suggesting a basis for municipal liability, but focuses solely on the acts of the police officers. While the officers are City employees, their acts, even if tortious, are not a basis for imposing liability on the City under section 1983. *See Brown*, 520 U.S. at 403. Accordingly, Defendant's motion for summary judgment on Plaintiff's municipal liability claims is granted and the City is dismissed from this action.

## IV. *Futility of Amendment*

In addition to arguing that Plaintiff has not alleged or established a basis for municipal liability, Defendant's motion addresses the merits of Plaintiff's false arrest and deliberate indifference claims. These claims are not adequately pled in the amended complaint, which names no individual defendants. Accordingly, Defendant's arguments do not seek to dismiss existing claims but, rather, anticipate a request by Plaintiff to amend his pleading pursuant to Rule 15(a) of the Federal Rules of Civil Procedure.

Rule 15(a) requires a plaintiff who is not entitled to amend his complaint as a matter of course to obtain the opposing party's written consent or the court's leave before amending his pleadings. Although the Rule provides that "[t]he court should freely give leave when justice so

requires," Fed. R. Civ. P. 15(a)(2), "[l]eave to amend may properly be denied if the amendment would be futile," *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)), or "where necessary to thwart tactics that are dilatory, unfairly prejudicial or otherwise abusive." *Ching v. United States*, 298 F.3d 174, 180 (2d Cir. 2002). Defendant is essentially arguing that it would be futile to permit Plaintiff to amend his pleading because the undisputed facts do not support his false arrest and deliberate indifference claims.

Plaintiff, however, has not expressly requested permission to amend his pleadings. To be sure, he states that he "want[s] to sue all of the necessary parties to get justice from the City and its employees for what happened ...." Plaintiff's Affirmation, ¶ 7. Yet, he also states that he is not in a position to name any individual defendants other than Officer Spataro, alleging that "the City did not provide [him] with the names of the many other officers [he] alleged were involved." *Id.*, ¶ 4. With respect to Officer Spataro, Plaintiff acknowledges that he should have been named as a defendant in the amended complaint, but alleges that he "did not know that [he] had to name the officers again." *Id.*, ¶ 5.

Since Plaintiff has not requested permission to amend his pleading, there is no need to address Defendant's arguments. However, even if Plaintiff's Affirmation could be construed as incorporating a request for leave to amend, the Court agrees with Defendant that it would be futile to permit Plaintiff to amend his complaint. As discussed below, the undisputed facts establish that Plaintiff's claims are without merit.

### A. The False Arrest Claim

"[T]he existence of probable cause is 'a complete defense to [a civil rights action arising from an arrest],' whether brought under state law or Section 1983." *Daniels v. D'Aurizo*, 564 F. Supp. 2d 194, 197 (W.D.N.Y. 2008) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)) (brackets added in *Daniels*)). "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *see Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012). "When information is received from a putative victim or an eyewitness, probable cause exists, ... unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)) (internal quotation omitted). Moreover, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Id.* (quoting *Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)).

In this case, the undisputed facts establish probable cause to arrest. The Arrest Report, which is attached to the Siddiqi Declaration as Exhibit C, indicates that a putative victim told the arresting officer that he had been struck with a lead pipe by Plaintiff and had suffered lacerations to his head and arms. There is no evidence that the police had reason to doubt the veracity of the complaining witness. To the contrary, his statement was consistent with information received by the 911 operator, who dispatched officers to Heberton Avenue in response to a report of a fight between a man with a knife and a man with a pipe. *See* Siddiqi Declaration, Ex. B. Although the

police might have received evidence to contradict the complaining witness's account had they questioned Plaintiff before effecting the arrest, Plaintiff's own testimony makes it clear that the police did not question him. Plaintiff's Deposition, pp. 47-48. The police had no obligation to do so, since the complaining witness's statement, coupled with the officers observations of that witness's physical condition, established probable cause to believe that Plaintiff had assaulted the complaining witness. *See Ricciuti*, 124 F.3d at 128; *Curley*, 268 F.3d at 70.

### B. Deliberate Indifference to Serious Medical Needs

Claims of deliberate indifference to serious medical needs are brought under various Constitutional provisions, depending on whether the plaintiff has been convicted and whether the plaintiff is in federal or state custody. A convicted prisoner's claim of deliberate indifference is analyzed under the Eighth Amendment, which prohibits "cruel and unusual punishment." *See Weyant*, 101 F.3d at 856. The "cruel and unusual punishment" proscription does not apply to pre-trial detainees, however, because a pre-trial detainee is not being punished. *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000). A person detained prior to conviction receives protection against mistreatment under the Due Process Clause of the Fifth Amendment if the pretrial detainee is held in federal custody, or the Due Process Clause of the Fourteenth Amendment if held in state custody. *Id.* (applying Fifth Amendment to a federal detainee); *Liscio v. Warren*, 901 F.2d 274, 275-76 (2d Cir. 1990) (applying Fourteenth Amendment to a state detainee). Since Plaintiff was a state detainee, his claim is brought under the Due Process Clause of the Fourteenth Amendment.

The law relating to Fourteenth Amendment claims by pre-trial detainees in state custody has changed since this issue was briefed by the parties in early 2016. Then, "[c]laims for

deliberate indifference to a serious medical condition or other serious threat to the health or

safety of a person in custody [were] ... analyzed under the same standard irrespective of whether

they [were] brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman*, 581

F.3d 63, 72 (2d Cir. 2009), *overruled by Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017). That

standard required a plaintiff to establish two elements: "that she had a 'serious medical

condition' and that it was met with 'deliberate indifference.'" *Cuoco*, 222 F.3d at 106. To

establish a "serious medical condition" under the first element, which is often referred to as the

"objective prong," the plaintiff was required to establish "a condition of urgency, one that may

produce death, degeneration, or extreme pain." *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990)

(Pratt, J., dissenting) (citing cases). In order to establish deliberate indifference under the second

element, which is often referred to as the "subjective prong," the plaintiff had to show that the

defendant "'kn[ew] of and disregard[ed] an excessive risk to [the plaintiff's] health ... [and] was

'both ... aware of facts from which the inference could be drawn that a substantial risk of serious

harm exist[ed], and ... also dr[e]w the inference.'" *Caiozzo*, 581 F.3d at 72 (quoting *Farmer v.*

*Brennan*, 511 U.S. 825, 837 (1994)).

    In February 2017, the Second Circuit expressly overruled *Caiozzo* "to the extent that it

determined that the standard for deliberate indifference is the same under the Fourteenth

Amendment as it is under the Eighth Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir.

2017). The *Darnell* Court noted that in *Farmer*, the Supreme Court "concluded that deliberate

indifference is properly equated with the *mens rea* of 'recklessness,'" *id.* at 32, but observed that

recklessness could be defined two ways. Specifically, the Supreme Court noted "that

recklessness could be defined according to an objective standard akin to that used in the civil

context, which would not require proof of an official's actual awareness of the harms associated with the challenged conditions, or according to a more exacting subjective standard akin to that used in the criminal context, which would require proof of such subjective awareness." *Id.* (citing *Farmer*, 511 U.S. at 836-37). In *Farmer*, in which the plaintiff was a convicted prisoner, the Supreme Court used the subjective standard, requiring that a prison official "appreciate the risk to which a prisoner was subjected" by inaction. *Id.* at 35. Under that standard, a defendant could not be found liable for deliberate indifference unless he was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and actually drew the inference. *See Farmer*, 511 U.S. at 837.

In *Kingsley v. Hendrickson*, — U.S. —, 135 S.Ct. 2466 (2015), however, the Supreme Court concluded that excessive force claims brought under the Fourteenth Amendment do not require the same subjective intent standard as excessive force claims brought under the Eighth Amendment. This undercut the reasoning in *Caiozzo*, and prompted the Second Circuit to adopt an objective standard for determining deliberate indifference under the so-called subjective prong in cases involving pretrial detainees in state custody. In *Darnell*, the Second Circuit ruled that "to establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

24

Even under this new, lower standard, however, it is clear that Plaintiff's due process rights were not violated. First, Plaintiff's medical condition was not particularly urgent but, at most, an aggravation of a degenerative back condition which the middle-aged Plaintiff had been enduring for at least five years prior to the incident. According to a radiological report contained in Exhibit C to Plaintiff's Affirmation, Plaintiff had an MRI in August 2007 which revealed extradural defects in Plaintiff's cervical spine and bulging discs and other abnormalities in his lumbosacral spine. These back problems were already causing chronic pain prior to the incident at bar. According to "Physician Notes" generated during his May 18, 2013, visit to the Richmond University Medical Center—also included in Exhibit C—Plaintiff told the Emergency Room personnel that he was already seeing Dr. Lee, a pain management specialist. Moreover, those same notes reflect that "back pain" had prompted Plaintiff to visit the Emergency Room on April 17, 2012—about one month prior to the incident.

Although Plaintiff testified that he complained of "extreme pain" at the 120th Precinct and was "in tears" the following day, Plaintiff's Deposition, pp. 34-35, the records from Richmond University Medical Center state that he was only in "mild distress" when he arrived at the Emergency Room around 12:30 p.m. on May 18, 2013. He told the medical personnel that his lower back pain increased after the fight, but the examination revealed only diffuse tenderness in the paralumbar area. He was diagnosed with only a "mild spasm." He was treated with an injection of a nonsteroid anti-inflammatory drug and given a ten milligram dose of Flexeril, a muscle relaxant, and reported feeling better an hour later. He was released at 3:30 p.m., three hours after arriving in the Emergency Room.

In light of these medical records, no reasonable fact-finder could find that the police were reckless in delaying the trip to the hospital for approximately 25 hours. The records reflect that

Plaintiff was not so seriously injured as to require immediate medical attention. Moreover, the undisputed evidence suggests that the delay in getting Plaintiff to the doctor was not intentional, but caused by staff shortages. According to Plaintiff's own testimony, the officer who ultimately escorted him to the hospital explained that he was the only officer available to take detainees to a doctor and that he had been out the day of Plaintiff's arrest. (Plaintiff's Deposition, p. 35). Accordingly, it would be futile to permit Plaintiff to amend his pleading to raise this Fourteenth Amendment Due Process claim.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted. Plaintiff has not requested permission to amend his pleading to add additional defendants and the undisputed facts show that it would be futile for Plaintiff to do so. Accordingly, the Clerk of Court is directed to enter judgment in favor of Defendant and to close this case.

**SO ORDERED.**

/s/ *Sandra L. Townes*

SANDRA L. TOWNES
United States District Judge

Dated: March 30, 2017
        Brooklyn, New York